SEALED
9/27/18 ay
UNSEALED PER ORDER OF COURT

FILED
18 SEP 25 PM 3:12
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: VRC       DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

April 2018 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>v.<br><br>SAM SARKIS SOLAKYAN,<br><br>  Defendant. | Case No. **18 CR 4163 BAS**<br><br>I N D I C T M E N T<br><br>Title 18, U.S.C., Sec. 1349 - Conspiracy to Commit Honest Services Mail Fraud and Health Care Fraud; Title 18, U.S.C., Secs. 1341 and 1346 - Honest Services Mail Fraud; Title 18, U.S.C., Sec. 2 - Aiding and Abetting; Title 18, U.S.C., Sec. 981(a)(1)(C), and Title 28, U.S.C., Sec. 2461(c) - Criminal Forfeiture |

The grand jury charges, at all times relevant:

**INTRODUCTORY ALLEGATIONS**

**DEFENDANT AND OTHER PARTICIPANTS**

1. Defendant SAM SARKIS SOLAKYAN ("SOLAKYAN") was the President, Chief Executive Officer, Secretary, Chief Financial Officer, and only director of record of Vital Imaging, Inc., with a primary business address in Glendale, California. He was also the President, CEO, CFO, and a director of San Diego MRI Institute, which had an address of record in Burbank, California, but provided services to patients at a location on Ruffin Road in San Diego. Defendant was the Chairman of the Board and Secretary of Global Holdings, LLC and Empire Radiology, LLC, both of which reported a primary business address in Glendale, California.

VHC:CPH:FAS(1):nlv:San Diego
9/25/18

1 RMC

In addition, defendant owned and controlled other companies, including Access Integrated Healthcare, LLC, d.b.a AIH Imaging; Access Imaging, LLC; Paramount Management Services, LLC; and Capital Edge Holdings, LLC (all together, "Solakyan's Companies"). Through Solakyan's Companies, defendant operated diagnostic screening facilities that, among other services, conducted Magnetic Resonance Imaging ("MRI") scans. Defendant operated diagnostic imaging facilities throughout California, including in Richmond, Hayward, San Jose, Garden Grove, Anaheim, Burbank, and San Diego.

2. Dr. Steven Rigler (charged elsewhere) was a chiropractor licensed to practice in California, who operated three clinics in the Southern District of California specializing in chiropractic medicine.

3. Alexander Martinez (charged elsewhere) managed Dr. Rigler's clinics, first in Calexico, then also in San Diego and Escondido, and, in that capacity, controlled (on Dr. Rigler's behalf) the referral of patients to ancillary service providers.

4. Fermin Iglesias and Carlos Arguello (both charged elsewhere) recruited injured workers to seek Workers' Compensation benefits in the state of California. Iglesias and Arguello controlled and operated multiple entities, including Providence Scheduling, Inc., MedEx Solutions, Inc., Meridian Medical Resources, Inc. d.b.a. Meridian Rehab Care, and Prime Holdings, Int., Inc.

**PHYSICIANS' DUTY TO THEIR PATIENTS**

5. Physicians, including doctors, surgeons, and chiropractors, owed a fiduciary duty to their patients. This duty required that physicians act in their patients' best interests, and not for their own professional, pecuniary, or personal gain. Under California law, a physician had a fiduciary duty to disclose all information material to

2

the patient's decision when soliciting a patient's consent to a medical procedure; such information included personal interests unrelated to the patient's health, whether research or economic, that might affect the physician's professional judgment. Accepting kickbacks, bribes, and referral fees without the patient's consent was a breach of a physician's fiduciary duty to his patient.

## CALIFORNIA WORKERS' COMPENSATION SYSTEM

6. The California Workers' Compensation System ("CWCS") required employers in California to provide Workers' Compensation benefits to employees for qualifying injuries sustained in the course of employment. Under the CWCS, all claims for payments for services or benefits provided to the injured employee, including medical and legal fees, were billed directly to, and were paid by, the insurer. If the insurer did not pay, the provider could file a lien against the employee's Workers' Compensation claim, which accrued interest until paid in an amount ordered by the Workers' Compensation Appeals Board ("WCAB") or as negotiated between the insurer and the provider.

7. The CWCS required claims administrators to authorize and pay for medical care that was "reasonably required to cure or relieve the injured worker from the effects of his or her injury," and included medical, surgical, chiropractic, acupuncture, and hospital treatment.

8. The CWCS and private and public CWCS insurers were "health care benefit programs" under Title 18, United States Code, Section 24, that is, a public or private plan or contract, affecting commerce, under which any medical benefit, item, or service was provided to an individual, and any individual or entity who provided a medical benefit, item or service for which payment may be made under the plan or contract.

3

9. Effective January 1, 2012, California Labor Code Section 139.3 made it a crime for a physician to refer Workers' Compensation patients for a variety of medical goods and services, including diagnostic imaging services and pharmacy goods, to an entity in which that physician had a financial interest. A financial interest included any remuneration, rebate, subsidy, or other form of direct or indirect payment.

10. According to California Labor Code Section 3209.3, the term "physician" in the Labor Code included physicians and surgeons holding an M.D. or D.O. degree, psychologists, acupuncturists, optometrists, dentists, podiatrists, and chiropractic practitioners licensed by California state law and within the scope of their practice as defined by California state law.

## Count 1
**CONSPIRACY TO COMMIT HONEST SERVICES MAIL FRAUD AND HEALTH CARE FRAUD**
**18 U.S.C. § 1349**

11. Paragraphs 1 through 10 of this Indictment are realleged and incorporated by reference.

12. Beginning on a date unknown no later than mid-2013, and continuing through at least November 2016, within the Southern District of California and elsewhere, defendant SAM SARKIS SOLAKYAN intentionally conspired with Dr. Steven Rigler, Fermin Iglesias, Providence Scheduling, Medex Solutions, Carlos Arguello, Alexander Martinez, and others to:

    a. commit Honest Services Mail Fraud, that is, to knowingly and with the intent to defraud, devise and participate in a material scheme to defraud and to deprive patients of the intangible right to their physicians' honest services, and for the purpose of executing such scheme, mail and cause to be mailed via the U.S. Postal Service any

4

matter and thing, in violation of Title 18, United States Code, Sections 1341 and 1346; and

      b.    commit Health Care Fraud, that is, to knowingly and with the intent to defraud, devise and participate in a material scheme to defraud a health care benefit program, and to obtain money and property owned by, and under the custody and control of, a health care benefit program, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1347.

### FRAUDULENT PURPOSE

13.    It was the goal of the conspiracy for defendant to fraudulently obtain money from health care benefit programs for services provided to Workers' Compensation patients that defendant procured by paying bribes and kickbacks to the referring physicians.

### MANNER AND MEANS

14.    The conspirators used the following manner and means, among others, in pursuit of their fraudulent purpose:

      a.    It was a part of the conspiracy that defendant and his conspirators offered to pay, and paid, compensation to physicians (and those acting on their behalf) to refer Workers' Compensation patients to Solakyan's Companies for MRI and other services.

      b.    It was a further part of the conspiracy that the compensation the co-conspirators offered to physicians in exchange for their referrals consisted of either a steady supply of new patients (the "cross-referral" method), or direct payments ("cash" method).

      c.    It was a further part of the conspiracy that the co-conspirators obscured the true nature of their financial relationships in order to conceal their corrupt kickback and bribery scheme, including by entering into various sham agreements such as contracts for

"marketing," "administrative services," and "scheduling," when in reality the money paid by defendant amounted to volume-based, per-scan bribes and kickbacks to induce physicians to refer patients to Solakyan's Companies.

  d. It was a further part of the conspiracy that, as part of the cross-referral method, Iglesias and Arguello required physicians to refer patients for a minimum number of ancillary medical services and goods in order for the conspirators to send new patients to the physician.

  e. It was a further part of the conspiracy that if the physician failed to meet the minimum quota, co-conspirators Iglesias and Arguello stopped referring new patients to that physician, notwithstanding any "marketing" or other agreement they had entered into on paper to justify the referral of new patients to that physician.

  f. It was a further part of the conspiracy that, over the course of their scheme, defendant, using bank accounts in the names of Global Holdings and Empire Radiology, paid Iglesias and Arguello, through their company MedEx, over $8.8 million to obtain MRI referrals from physicians compensated by Iglesias and Arguello.

  g. It was a further part of the conspiracy that defendant also paid physicians, including Dr. Rigler, cash for each MRI scan referred to Solakyan's Companies.

  h. It was a further part of the conspiracy that defendant paid a fee for each scan that the physician referred, thereby creating an incentive for the physician to recommend more scans than necessary for the patient.

  i. It was a further part of the conspiracy that defendant caused MRI scans to be conducted at San Diego MRI Institute, located at

6

5395 Ruffin Road, Suite 100, in San Diego, to serve patients referred by San Diego physicians, including Dr. Rigler.

  j. It was a further part of the conspiracy that defendant's companies, including San Diego MRI Institute and Vital Imaging, sent via U.S. mail, claims for reimbursement to CWCS insurers, for services provided to patients whose referrals had been procured through unlawful kickbacks and bribes to the referring physician.

  k. It was a further part of the conspiracy that the co-conspirators concealed from patients, and intended to cause the physicians to conceal from patients, the bribe and kickback payments, in violation of those physicians' fiduciary duties to their patients and in violation of California law.

  l. It was a further part of the conspiracy that the co-conspirators concealed from insurers, and intended to cause the physicians to conceal from insurers, the bribe and kickback payments, which would have rendered the claims for reimbursement unpayable under California law.

  m. It was a further part of the conspiracy that defendant and his co-conspirators knew and intended that the referring physicians, including Dr. Rigler, would submit false statements to health care benefit programs, including certifications of compliance with California Labor Code Section 139.3, that is, that the physician had no financial interest in the entity that received the referral, when in reality defendant and his co-conspirators were compensating the physicians via the cross-referral and cash methods.

  n. It was a further part of the conspiracy that defendant filed liens, and intended to file liens, through Solakyan's Companies,

7

to collect payment on claims for ancillary medical services procured through the payment of bribes and kickbacks.

o. It was a further part of the conspiracy that defendant submitted and caused to be submitted over $284 million in claims for ancillary medical services procured through the payment of bribes and kickbacks.

**OVERT ACTS**

15. In furtherance of the conspiracy and in order to effect the objects thereof, defendant and others committed or caused the commission of the following overt acts within the Southern District of California and elsewhere:

a. In late 2011 or early 2012, defendant agreed with Iglesias and Arguello that defendant would pay Iglesias and Arguello for each scan referred by MedEx and completed by one of Solakyan's Companies, knowing and intending that Iglesias and Arguello would obtain the patients by paying bribes and kickbacks to the referring physicians.

a. On or about January 1, 2012, defendant, through his company Global Holdings, Inc., and Iglesias, on behalf of Medex, entered into a "Scheduling Services Agreement," which supposedly required Medex to schedule patients and collect paperwork from referring physicians, at a rate of $200.00 per patient.

b. In or about August 2013, Iglesias, Arguello, and Julian Garcia (charged elsewhere) agreed to send Workers' Compensation patients to Dr. Rigler's San Diego and Escondido clinics if Dr. Rigler, in turn, referred those applicants for a certain quota of ancillary procedures and Durable Medical Equipment ("DME") from providers designated by Iglesias and Arguello, including, for MRI scans, Solakyan's Companies.

8

c. On or about September 10, 2013, defendant issued a check in the amount of $93,650.00 from an account in the name of one of Solakyan's Companies to Medex Solutions, Inc., to pay for patient referrals.

d. On or about October 8, 2013, defendant issued a check in the amount of $310,500 from an account in the name of one of Solakyan's Companies to Medex Solutions, Inc., to pay for patient referrals.

e. On or about November 8, 2013, defendant issued a check in the amount of $273,300 from an account in the name of one of Solakyan's Companies to Medex Solutions, Inc., to pay for patient referrals.

f. On or about December 6, 2013, defendant issued a check in the amount of $346,800 from an account in the name of one of Solakyan's Companies to Medex Solutions, Inc., to pay for patient referrals.

g. On or about January 2, 2014, defendant issued a check in the amount of $300,000 from an account in the name of one of Solakyan's Companies to Medex Solutions, Inc., to pay for patient referrals.

h. On or about January 24, 2014, defendant issued a check in the amount of $425,650 from an account in the name of one of Solakyan's Companies to Medex Solutions, Inc., to pay for patient referrals.

i. On or about March 1, 2014, defendant, through his company Global Holdings, Inc., and Iglesias, on behalf of Medex, entered into a "Outsourced Administrative Services Agreement," which replaced their prior Scheduling Services Agreement, and which required Medex to collect paperwork from physicians, coordinate with insurance companies, and schedule patients, in exchange for $50 per MRI scan.

j. On each of March 13, March 25, and April 8, 2014, defendant issued checks in the amount of $100,000 from an account in

the name of one of Solakyan's Companies to Medex Solutions, Inc., to pay for patient referrals.

        k.    On or about July 2, 2014, defendant issued a check in the amount of $160,000 from an account in the name of one of Solakyan's Companies to Medex Solutions, Inc., to pay for patient referrals.

        l.    On or about July 29, 2014, defendant issued a check in the amount of $100,000 from an account in the name of one of Solakyan's Companies to Medex Solutions, Inc., to pay for patient referrals.

        m.    On or about October 2, 2014, defendant issued a check in the amount of $243,200 from an account in the name of one of Solakyan's Companies to Medex Solutions, Inc., to pay for patient referrals.

        n.    On or about October 31, 2014, defendant issued a check in the amount of $217,800 from an account in the name of one of Solakyan's Companies to Medex Solutions, Inc., to pay for patient referrals.

        o.    On or about December 8, 2014, defendant issued a check in the amount of $115,950 from an account in the name of one of Solakyan's Companies to Medex Solutions, Inc., to pay for patient referrals.

        p.    On or about January 22, 2015, defendant and Dr. Rigler discussed defendant paying cash directly to Dr. Rigler for patient referrals, in addition to the cross-referral method then in place with MedEx.

        q.    On or about January 22, 2015, while discussing how defendant could compensate Dr. Rigler for patient referrals, defendant acknowledged that MedEx already was compensating Dr. Rigler via the cross-referral method by supplying new patients to Dr. Rigler: "The only thing is, you know, obviously, your case volume, how, how do we reciprocate because you don't have . . . like with Fermin [Iglesias] . . . he has new cases [to offer you]."

r. On or about January 22, 2015, defendant proposed paying Dr. Rigler cash for each scan referred to one of Solakyan's Companies: "But we can work something out where, you know, it's about, generally it's about forty bucks, fifty bucks per scan."

s. On or about January 22, 2015, defendant proposed the following bribe or kickback fee structure to Dr. Rigler: "[T]his is very cut and dry. It's per scan, per body part . . . three, uh, uh, three body parts per patient. Hundred, one-fifty, I mean everything's just very bam, bam, bam."

t. On or about February 10, 2015, defendant advised his executives in an email that, "We should go through each referral source and tag them with in-house contacts as handlers for that account." In the same email, he listed himself as the "handler" for MedEx, the company owned by Iglesias and Arguello.

u. On or about February 19, 2015, Alexander Martinez provided to Solakyan's Companies, via a Google doc, patient referrals, including referrals of 2 MRIs for Dr. Rigler's patient Felipe B.

v. On or about March 1, 2015, defendant, through his company Global Holdings, Inc., and Iglesias, on behalf of Medex, entered into a new "Outsourced Administrative Services Agreement," which replaced the prior version. Although the services MedEx was to provide were largely the same, this new agreement lowered the payment to $30 per MRI scan.

w. On or about March 18, 2015, defendant issued a check in the amount of $100,000 from an account in the name of one of Solakyan's Companies to Medex Solutions, Inc., to pay for patient referrals.

x. On or about March 20, 2015, defendant and Dr. Rigler discussed the declining reimbursement for MRI scans from insurance

companies, and defendant acknowledged that he was still paying "20 bucks" in "marketing" with "Fermin" for each MRI.

  y. On or about March 20, 2015, defendant inquired and learned that Iglesias credited $50 for each MRI scan Dr. Rigler referred against the minimum quota Dr. Rigler was expected to meet for each patient.

  z. On or about March 20, 2015, defendant reassured Dr. Rigler that his earlier offer was still open, but only for a limited time: "So just so you know, between us, okay, so anything [referred] up until March 1st . . . is still 50 [$50 per scan]."

  aa. On or about March 24, 2015, to conceal his cash payments to Dr. Rigler for patient referrals, defendant used "reports" as code for cash in asking Dr. Rigler if he could "send my driver with your reports," then stated, "I'll have him contact you then I'll just send him with your reports, buddy."

  bb. On or about March 24, 2015, in the same conversation, defendant confirmed the number of scans that Dr. Rigler had referred to defendant's MRI company for which Dr. Rigler would be paid: "So there's a total of 51."

  cc. On or about March 25, 2015, defendant directed his driver to deliver a sealed envelope to Dr. Rigler containing $2,600 in $100 bills.

  dd. On or about March 25, 2015, defendant issued a check in the amount of $101,650 from an account in the name of one of Solakyan's Companies to Medex Solutions, Inc., to pay for patient referrals.

  ee. In or about March 2015, defendant submitted or caused to be submitted to insurance companies requests for reimbursement exceeding

$150,000, for the 51 MRI scans defendant procured by paying $2,600 in bribes or kickbacks to Dr. Rigler.

ff. On or about July 1, 2015, defendant issued a check in the amount of $181,162 from an account in the name of one of Solakyan's Companies to Medex Solutions, Inc., to pay for patient referrals.

gg. On each of April 22, May 23, June 21, July 20, August 18, September 20, October 20, and November 23, 2016, defendant issued payments in the amount of $20,000 from an account in the name of one of Solakyan's Companies to Medex Solutions, Inc., to pay for patient referrals.

All in violation of Title 18, United States Code, Section 1349.

## Counts 2-12
## HONEST SERVICES MAIL FRAUD
## 18 U.S.C. §§ 1341, 1346 & 2

16. Paragraphs 1 through 10 of this Indictment are realleged and incorporated by reference.

17. Beginning on a date unknown no later than mid-2013, and continuing through at least November 2016, within the Southern District of California and elsewhere, defendant SAM SARKIS SOLAKYAN, knowingly and with the intent to defraud, devised and participated in a material scheme to defraud, that is, to deprive patients of their intangible right to their physician's honest services.

18. Paragraphs 13 through 15 of this Indictment are realleged and incorporated by reference as more fully describing the scheme to defraud, that is, to deprive patients of their intangible right to their physician's honest services.

//
//

# EXECUTIONS OF THE SCHEME TO DEFRAUD

19. On or about the following dates, within the Southern District of California and elsewhere, defendant SAM SARKIS SOLAKYAN, for the purpose of executing the scheme, caused the following mail matter to be placed in a post office and authorized depository for mail matters to be delivered by the United States Postal Service and private and commercial interstate carrier:

| Count | Date | Item Mailed |
|---|---|---|
| 2 | July 23, 2014 | Request for payment totaling $16,790 for 6 MRI scans for Jose C., sent to Berkshire Hathaway, secured through the payment of a bribe to Dr. Rigler |
| 3 | Sept. 3, 2014 | Request for payment totaling $1,955 for 1 MRI scan for Jose C., sent to Berkshire Hathaway, secured through the payment of a bribe to Dr. Rigler |
| 4 | Oct. 14, 2014 | Request for payment totaling $6,440 for 2 MRI scans for Liliana C., sent to ESIS, secured through the payment of a bribe to Dr. Rigler |
| 5 | Oct. 21, 2014 | Request for payment totaling $5,175 for 2 MRI scans for Jose C., sent to Berkshire Hathaway, secured through the payment of a bribe to Dr. Rigler |
| 6 | March 5, 2015 | Request for payment totaling $3,220 for 1 MRI scan for Gabriel M., sent to Acclaim Risk Management, secured through the payment of a $50 bribe to Dr. Rigler |
| 7 | March 6, 2015 | Request for payment totaling $3,220 for 1 MRI scan for Gabriel M., sent to Acclaim Risk Management, secured through the payment of a $50 bribe to Dr. Rigler |
| 8 | March 11, 2015 | Request for payment totaling $16,100 for 5 MRI scans for Refugio L., sent to Zenith, secured through the payment of a $250 bribe to Dr. Rigler |
| 9 | March 11, 2015 | Request for payment totaling $8,395 for 3 MRI scans for Virginia P., sent to Sedgwick, secured through the payment of a $150 bribe to Dr. Rigler |

| Count | Date | Item Mailed |
|---|---|---|
| 10 | March 18, 2015 | Request for payment totaling $3,220 for 1 MRI scan for Blasa R., sent to Sedgwick, secured through the payment of a $50 bribe to Dr. Rigler |
| 11 | March 26, 2015 | Request for payment totaling $6,440 for 2 MRI scans for Felipe B., sent to Gallagher Bassett, secured through the payment of a $100 bribe to Dr. Rigler |
| 12 | April 3, 2015 | Request for payment totaling $6,440 for 2 MRI scans for Maria R., sent to York Insurance, secured through the payment of a $100 bribe to Dr. Rigler |

All in violation of Title 18, United States Code, Sections 1341, 1346 and 2.

**CRIMINAL FORFEITURE**

20. Paragraphs 1 through 19 of this Indictment are realleged and incorporated as if fully set forth herein for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

21. Upon conviction of one or more of the offenses of Conspiracy and Honest Services Mail Fraud as alleged in Counts 1 through 12, defendant SAM SARKIS SOLAKYAN shall forfeit to the United States all right, title, and interest in any property, real or personal, that constitutes or is derived from proceeds traceable to such offenses.

22. If any of the above described forfeitable property, as a result of any act or omission of defendant SAM SARKIS SOLAKYAN (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of defendant SAM SARKIS SOLAKYAN up to the value of the forfeitable property described above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

DATED: September 25, 2018.

A TRUE BILL:

_____
Foreperson

ADAM L. BRAVERMAN
United States Attorney

By: _____
VALERIE H. CHU
Assistant U.S. Attorney

By: _____
CAROLINE P. HAN
Assistant U.S. Attorney

By: _____
 for FRED SHEPPARD
Assistant U.S. Attorney